**Joy Lawanda (Plunk) WILDER, Plaintiff and Counter–Defendant/Appellant,**

v.

**James Sampson WILDER, III, Defendant and Counter–Plaintiff/Appellee.**

Court of Appeals of Tennessee, Western Section, at Jackson.

July 21, 1992.

Application for Permission to Appeal Denied by Supreme Court Oct. 26, 1992.

Daniel Loyd Taylor, Daniel Loyd Taylor Law Office, Memphis, for appellant.

James D. Causey, Genevieve M. Dix, Memphis, for appellee.

HIGHERS, Judge.

This appeal arises out of a final decree of divorce entered by the Chancery Court at Fayette County terminating the parties' five and one-half year marriage. The trial court, after a hearing without a jury, awarded the divorce to the husband. The wife brought the instant appeal claiming that the trial court erred (1) in failing to award the divorce to her; (2) in failing to impose sanctions against the husband for his admitted perjury; (3) in its division of marital property, and concomitantly, in its determination of the separate property of the parties; and, (4) in its refusal to award alimony to her.

I.

The parties were married on October 5, 1984. At the time of the trial on this matter each was forty-one years old and had been previously married. No children were born to the marriage; the wife has two sons by a prior marriage while the husband has no children. At the time of the trial, the husband was a practicing attorney with an office in Somerville, Tennessee, and was part-time General Sessions and Juvenile Court Judge for Fayette County. The wife has a high school education and at the time of trial was working as a technician in an optometrist's office.

The main issue in this appeal pertains to the wife's claim to a percentage of the husband's interest in the "Velsicol fee." On May 23, 1978, the husband was first approached by potential plaintiffs seeking to file a lawsuit against the Velsicol Chemical Corporation for contaminating the water supply in an area of Hardeman County, Tennessee, by a chemical toxic waste dump operated by Velsicol. On December 4, 1978, the husband, along with a number of other attorneys representing various plaintiffs, filed a class action suit against Velsicol in the Circuit Court at Hardeman County seeking damages for personal injuries and property damage caused by the contaminated water supply. The suit was eventually removed to the United States District Court for the Western District of Tennessee.

At the time the husband was first approached by the Velsicol plaintiffs in May of

1978, he was married to his first wife to whom he had been married since 1973. The husband was divorced from the first wife on May 23, 1983. Under the final decree of divorce entered in the husband's first divorce, the husband agreed to give his first wife ten percent of the eventual attorney's fee collected in the Velsicol case as a part of the division of marital assets.

The Velsicol trial began on June 21, 1982. Ninety-seven witnesses testified during the sixty-five days of the trial over an eighteen-month period. Sixty of the witnesses who testified were experts and the husband incurred a great deal of litigation expense in preparing for and trying the Velsicol case. He testified at the divorce hearing that at the time of the Velsicol trial, he had borrowed at least $71,000 to finance the litigation.

The Velsicol trial was completed on December 18, 1983. On October 5, 1984, the husband married his second wife, the plaintiff in the instant lawsuit. In August of 1986, the trial court in the Velsicol case rendered a verdict in favor of the plaintiffs for 21 million dollars. The defendants appealed the trial court's rulings and the joint venture of attorneys representing the Velsicol plaintiffs employed outside counsel to handle the appeal. In August of 1987, the Sixth Circuit Court of Appeals issued its decision reducing the Velsicol verdict by 10 million dollars and remanding the case to the trial court for further proceedings. None of the parties to the Velsicol suit appealed the Sixth Circuit's judgment to the United States Supreme Court, and in November of 1988, the parties to the Velsicol suit began settlement negotiations. In February of 1989, the parties to the Velsicol suit reached a settlement whereby the plaintiffs were to receive a total judgment in the amount of 10 million dollars. As of the time of the trial, the husband had received two disbursements of the Velsicol attorney's fee from the judgment paid by the defendants, one in the amount of $187,149.04 which was used to pay much of the expense generated by the Velsicol litigation and an-

other one for $375,000 before taxes, expenses, and payments to the first wife. There remained, at the time of the trial, litigation involving the husband and several of the other Velsicol attorneys regarding the remaining 1.2 million dollars in attorney's fees outstanding at that time.[1]

At the time of the parties' marriage, the wife owned, as part of her separate estate, a home which had approximately $35,000 in equity. During the course of the marriage, the wife sold her home, realizing net proceeds of slightly over $35,000. The home was the only asset of real value in the wife's separate estate coming into the marriage. Both the husband and the wife testified that the proceeds of the sale of the wife's home were not segregated and that they were totally available to the husband for his use during the marriage. The husband, on the other hand, was deeply in debt at the time of the marriage, owing sizeable sums of money on the litigation expenses incurred in the Velsicol trial.

It is undisputed that during the first year of the parties' marriage the wife worked in the husband's law office without pay. There is some dispute as to exactly how many hours per week the wife spent in the husband's law office. The wife testified that she worked five days a week on a regular basis. The husband, on the other hand, testified that while the wife may have worked an average of five days a week, quite often she would only work a few hours a day. The duties performed by the wife at the husband's law office included bookkeeping and maintaining time sheets on the Velsicol case as well as various other duties connected with the Velsicol litigation.

In December of 1985, the husband was appointed General Sessions and Juvenile Court Judge of Fayette County, a part-time position. The husband continued to operate his law practice while sitting as judge. Some time in the spring of 1988, the husband began to realize that he needed to bring a

1. Following the trial in the instant case, but before oral argument, the Velsicol attorney's fee litigation was finally disposed of. The wife subsequently filed a motion in this Court to require the husband to reveal the total amount of attor-

ney's fee the husband received from the Velsicol litigation and for us to consider this post-judgment fact. This motion is dealt with later in this opinion.

partner into his law firm to help him handle his caseload because of the increased work being generated by his judicial duties and by the Velsicol case. Around that same time, the husband had begun a friendship with Lauren Laughlin, an attorney, living near Somerville, whom the husband was representing in a divorce action. The husband and Laughlin decided to enter into a partnership agreement whereby Laughlin was to purchase sixty percent of the law practice which the husband was to finance over a six-year period.

The wife admitted that in November of 1988, she began having sexual relations with Laughlin. In her complaint filed in this matter, the wife states that she and her husband were separated on November 22, 1988, and she testified that in January of 1989 she moved out of the marital residence.

In February of 1989, the husband discovered that Laughlin had stolen a certificate of deposit from his law office which was being held for a client. Laughlin was eventually convicted of the theft of the certificate of deposit and, at the time of the trial, was serving time in prison for that crime. The wife testified at trial that she continued to live with Laughlin until he was imprisoned for the theft of the certificate of deposit.

On January 5, 1989, the wife filed the divorce complaint in the instant case seeking a divorce on the grounds of irreconcilable differences and cruel and inhuman treatment by the husband. At trial, the wife testified that the reason she was seeking a divorce was because of the husband's excessive drinking and the fact that he would become irritable, moody and abusive when he was drinking. The husband filed a countercomplaint for divorce on the grounds of the wife's adulterous relationship with Laughlin and on the grounds of cruel and inhuman treatment by the wife. The husband testified in a discovery deposition taken in this matter on August 27, 1989, that he had not had any adulterous relationships at any time during the marriage up until the date of the deposition. The husband later recanted his testimony in a deposition taken in December of 1989, and admitted that he had perjured himself in his earlier deposition by testifying that he had not engaged in any adulterous relationships up to that date. The husband admitted in the second deposition that he had been having sexual relations with a woman other than his wife, but that he was afraid to state that in his deposition because the woman with whom he was having an affair was, at the same time, involved in a heavily contested child custody case and he did not want to jeopardize her chances in her trial because he believed she was going to deny at her trial having had sexual relations with him. The husband also admitted in his second deposition that there were three other ladies with whom he had had sexual relations after he had separated from his wife but before his first deposition.

At the trial on this matter, the wife testified that she was working full time as a technician for an optometrist in Somerville, Tennessee, at a weekly gross wage of $200. She also testified that she was living in a rented house without air-conditioning and that since the marriage she had no savings set aside. The husband testified that ever since the fiasco of his partnership with Laughlin he has been unable to obtain legal malpractice insurance and therefore was unable to take on any new cases. He testified that he had purchased for $10,000 a "tail policy" which allowed him to have malpractice coverage on the cases he was unable to farm out to other attorneys and which he was in the process of wrapping up. According to the husband, at the time of this trial he still had approximately $35,000 in uncollected fees, however, a large portion of these fees would be uncollectible. According to the husband, his only real income at the time of the trial was the money he was receiving from Fayette County for being the part time General Sessions and Juvenile Court Judge.

■ At the time of the trial in this matter, the husband was expecting to receive the remainder of his interest in the attorney's fees arising out of the Velsicol litigation, which amount was unknown at the time of the divorce proceedings. Since the time of the trial on this matter, however, the husband has received the remainder of his interest in this attorney's fee. The wife has accordingly moved this Court to order the hus-

band to disclose the amount of fee he received subsequent to the trial of this matter and for this Court to consider this post-judgment fact in determining the merits of her appeal. In light of our holding with regard to the wife's claim to a share of the Velsicol fee as marital property, we find that this motion is well taken and order the husband to supplement the record with the necessary documentation to establish, not only the amount of fee he has ultimately received from the Velsicol litigation; but also, the amount of all expenses incurred in the litigation, the income tax consequences to the husband upon receipt of the remainder of the fee, the tax consequences as a whole to the husband on the Velsicol monies received, and the amount of the fee paid to his first wife under his first divorce decree.

On April 12, 1990, the Chancery Court filed a Memorandum Opinion disposing of the issues raised in this divorce trial. The court granted the divorce to the husband on the grounds that the wife's adulterous relationship with Laughlin precipitated the break up of the marriage. The trial court also made a determination with regard to which items in the parties' estate were the separate property of each party and which items were a part of the marital estate. The trial court divided numerous items of personal property between the parties according to lists submitted by the parties as to which items were currently in their possession and which items more properly belonged to one party or the other.

The trial court determined that the husband's interest in the Velsicol fee was separate property belonging entirely to the husband. The trial court based this decision on the fact that the Velsicol trial had already been completed before the parties were married and therefore the wife's contribution to the preservation of the separate property was not enough to warrant treating any part of it as marital property. The trial court did, however, find that the husband had used $25,000 of marital property to finance the Velsicol case and accordingly awarded the wife $12,500 in his division of marital assets to compensate her. Furthermore, the trial court awarded the wife: (1) $29,750 as her interest in the marital residence, a vacant lot purchased during the marriage and the husband's law practice; (2) $8,000 to equalize the value of the distributed personalty of the parties; (3) $10,000 to compensate her for the funds realized from the sale of her personal residence sold during the marriage. Altogether the wife was awarded $60,250 under the division of marital property from which the court deducted $8,000 which was one-half of the amount paid by the husband on the automobile awarded to the wife, for a net award of $52,250. The trial court also awarded the wife one-half of her attorney's fees. As stated above, the husband received numerous items of personal property and the marital residence as his portion of the marital estate.

## II.

The wife first argues on appeal that the trial court erred in granting the divorce to the husband on the ground of inappropriate marital conduct rather than to her on the ground of cruel and inhuman treatment. The wife argues that since both parties have admitted to having adulterous relationships prior to the entry of the final decree of divorce, adultery cannot be used as a ground for divorce. Accordingly, the wife argues that she was entitled to a divorce on the ground of inappropriate marital conduct because of the husband's alleged excessive drinking and his violent temper and behavior towards her when he was drinking.

We agree with the wife's assertion that under T.C.A. § 36-4-112 she is entitled to an absolute defense to the husband's claim for an entitlement for divorce based on adultery since he has admitted to having committed a like act. However, the final decree of divorce entered in this case grants the husband a divorce on the ground of inappropriate marital conduct, not on the ground of adultery. In *Fox v. Fox*, 676 S.W.2d 956, 958 (Tenn.1984), our Supreme Court stated that in a situation where both parties to a divorce are guilty of adultery, one or the other of the parties may still be entitled to a divorce on other grounds upon a sufficient showing to support the other grounds of divorce. In the instant case, we see no difficulty in affirming

the trial court's holding that the wife's actions "destroyed this marriage, and with deliberate intent." This finding is born out by credible evidence which establishes that the precipitating factor to the breakup of this marriage was the wife's abandonment of the husband and her adulterous relationship with his law partner while the husband was negotiating the final settlement in the Velsicol lawsuit. Therefore, since the evidence does not preponderate against the trial court's decision granting the divorce to the husband on the ground of inappropriate marital conduct by the wife, the trial court's judgment in this regard is affirmed.

### III.

■ The wife next argues on appeal that the trial court erred in failing in impose sanctions against the husband for his admitted perjury. The wife argues that since a divorce proceeding is equitable in nature, the husband's perjury placed him in a court of equity with unclean hands and therefore he was not entitled to any relief from the court because of the equitable maxim that "one who comes into a court of equity with unclean hands shall be repelled at the courthouse door."

We agree with the wife's assertion that the husband's perjury in his discovery deposition offends the basic principles underlying our judicial system. Such an offense to our judicial system is particularly repulsive when committed by an officer of the court and member of the judiciary. In an unreported opinion of this Court, *Inman v. Inman,* (Tenn.App., W.S., October 18, 1989, Supreme Court opinion reported at 811 S.W.2d 870), we held that a husband who had committed perjury in sworn answers to discovery interrogatories submitted in his divorce action was not entitled to relief under his countercomplaint for divorce because his perjury placed him in a court of equity with unclean hands. In denying the husband relief because of his perjury, we stated that once a litigant has committed perjury and subsequently is caught red-handed, to allow him to seek and obtain the judicial relief sought tells the world that it is unnecessary for a litigant to speak the truth in a court of law.

The wife argues that under *Inman,* the trial court erred in granting the divorce to the husband because of his perjury earlier in the proceedings. While we certainly maintain our position as expressed in *Inman* that such perjury cannot be condoned because it attacks the very foundation of our judicial system, there is a sufficient distinction between the facts of the instant case and the facts of the *Inman* case to support the trial court's decision to award the divorce to the husband even in light of his perjury. The trial court specifically found that while the husband admitted committing perjury in his first deposition, a second deposition was rescheduled wherein he recanted the perjured portion of his testimony so that he might correct his wrong. This finding of the trial court is supported by the record in this case. Thus, the husband in the instant case attempted to alleviate some of the harm caused by his perjury prior to trial and was therefore not caught "red-handed" in the perjury as was the husband in *Inman.* We believe that this is a valid distinction between the case at hand and the *Inman* case and therefore, the trial court did not abuse its discretion in awarding the divorce to the husband even in light of his earlier perjury.

■ This is not to say, however, that we believe the husband's perjury should go unadmonished. The husband's perjury not only threatens the vitality of our judicial system, but also exposes him to the possibility of being faced with criminal charges for this illegal and destructive act. The husband's perjury should also greatly affect his credibility as a witness in the proceeding. Nevertheless, the trial court found that the husband's testimony should be accorded greater weight than that of the wife. In a nonjury case such as the present, such decisions by the trial court with regard to the credibility of witnesses are entitled to great weight, where the trial judge saw and heard the witnesses and observed their manner and demeanor on the stand and was therefore in a much better position than the appellate court to judge the weight and value of their testimony. *Duncan v. Duncan,* 686 S.W.2d 568 (Tenn.App.1984). Accordingly, we hold that even in light of the husband's perjury

with regard to his adulterous relationships after the parties' separated, the trial court did not err in granting the divorce to the husband.

### III.

The wife next argues on appeal that the trial court erred in not awarding her a portion of the Velsicol fee in its division of marital property. The trial court held that the husband's interest in the Velsicol fee was a separate asset which he had brought into the marriage and therefore the wife was not entitled to any portion of the fee in the division of marital property.

T.C.A. § 36–4–121, the statute governing the division of property in divorce actions, defines marital property as;

> all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date.

The statute further defines separate property as:

> (A) All real and personal property owned by a spouse before marriage;
>
> (B) Property acquired in exchange for property acquired before the marriage;
>
> (C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1); and
>
> (D) Property acquired by a spouse at any time by gift, bequest, devise or descent.

Under this statute it is clear that the Velsicol fee was a separate asset of the husband's at the time of the marriage. The wife does not dispute that at the time of marriage the husband had already acquired an interest in the potential fee. The wife argues, however, that her contribution to the preservation of this asset during the course of the marriage transmuted a portion of this separate asset into a marital asset and that she was entitled to a share of this marital asset under the equitable division of marital property.

A number of Tennessee decisions have recognized that, under the property division statute, a spouse who contributes the appreciation in value of a separate asset of the other spouse is entitled to ownership of an equitable share of the appreciation of the asset under T.C.A. § 36–4–121. See *Ellis v. Ellis*, 748 S.W.2d 424 (Tenn.1988). The husband argues, however, that the instant case is distinguishable because the value of the husband's interest in the Velsicol fee reached its maturity when the actual trial was completed on December 18, 1983, ten months prior to the parties' marriage. According to the husband, since the "value" of this asset did not increase, but in fact decreased by 10 million during the course of the marriage, the wife has not contributed to its appreciation as required by the statute. In support of this, the husband cites a number of Tennessee cases which have held that a spouse who does not materially contribute to an increase in the value of a separate asset is not entitled to any portion of that asset under the equitable division of marital property. *See Crews v. Crews*, 743 S.W.2d 182 (Tenn.App.1987).

We find that these cases cited by the husband are distinguishable. It is undisputed that the wife spent some amount of time working in the husband's law office, doing the bookkeeping and maintaining time sheets on the Velsicol case, without pay. T.C.A. § 36–4–121(c)(5) specifically states that in making the equitable division of marital property, the court is to consider:

> The contribution of each party to the acquisition, *preservation*, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled his or her role;

> .    .    .    .    .

This provision compels the court to consider even indirect contributions by a spouse to the

preservation of the other spouse's separate property in making the equitable division of marital property. In the instant case, the wife, by working in the husband's law office and working directly on the Velsicol litigation, has made a direct contribution to the preservation of this asset which warrants consideration in the division of marital assets.

Furthermore, we do not believe the wife's claim for a share of the Velsicol fee is defeated simply because the Velsicol trial was completed prior to the time of the marriage and the ultimate verdict was reduced by 10 million dollars during the course of the marriage. Throughout the course of the parties' marriage, the Velsicol fee was nothing more than a potential which might or might not materialize into a large sum of money. The wife's work in the husband's law office, especially that work done on the Velsicol case, must have in some way aided in the preservation of the potential fee. It would indeed be inequitable, given the undisputed fact that the wife directly contributed to the preservation of this asset, to deny her at least a small portion of the Velsicol fee in the equitable division of marital property.

■ Finally, we address husband's argument that the wife is not entitled to any share of the Velsicol fee because the wife's actions in having an adulterous relationship with his law partner while he was involved in the settlement negotiations of the Velsicol litigation not only precipitated the breakup of the marriage but also caused him a great deal of anxiety during a period of time when he needed to be concentrating on the Velsicol case. The statute governing the division of marital assets specifically provides that the court is not to consider the fault of either party in making this equitable division. Accordingly, we cannot consider the fact that the wife's adulterous relationship with Laughlin precipitated the breakup of this marriage in dividing this marital asset. Furthermore, the record clearly indicates that the wife had already spent a substantial number of hours working in the husband's law office prior to the commencement of her relationship with Laughlin and therefore she had already earned an interest in at least some share of this asset by contributing to

its preservation. We note, however, that any negative effect the wife's adultery may have had on the husband's ability successfully to negotiate a settlement of the Velsicol case should be taken into account in determining her appropriate share of the fee under the property division.

■ We must next determine what share of the Velsicol attorney's fee the wife is entitled to because of her contribution to its preservation during the course of the marriage. The wife testified at trial that she worked in the husband's law office five days a week from the time they were married in October of 1984 through December of 1985, at which time the husband was appointed General Sessions Judge of Fayette County. The wife testified that at that time she began working for a salary as secretary to the Juvenile Court but that she still continued to work in the husband's law office occasionally, on a part-time basis, without drawing a salary for those duties. The wife testified that her duties at the husband's law office included taking care of the individual accounts, accounts payable and receivable, maintaining the time sheets on the clients and on Velsicol and doing much of the legwork involved in the Velsicol litigation such as making copies, filing and keeping the Velsicol books updated.

The husband, on the other hand, did not dispute at trial that the wife had worked five days a week for a period of time without salary. The husband did testify, however, that the wife did not work forty hours in any given week, but instead, would work a few hours each day whenever it was convenient. His testimony was corroborated at trial by one of the husband's former paralegals, Patty Lessell.

After carefully considering the evidence adduced to trial as to the actual contribution made by the wife to the preservation of the Velsicol fee, as well as the negative impact that the wife's adultery may have had on the husband's ability to negotiate the settlement, we find that the wife should be awarded five percent of the husband's interest in the Velsicol fee after subtracting the litigation expenses paid by the husband from the fee, the income tax paid by the husband on the fee,

and the ten percent of the fee paid by the husband to his first wife under the divorce decree dissolving that marriage. As stated above, we grant the wife's petition to consider post-judgment facts, including the total amount of the fee received by the husband, the tax consequences of the fee on the husband, the amount of the fee paid over to the husband's first wife, and the amount of litigation expenses paid by the husband. We direct the husband to submit this information to the trial court so that a final determination can be made as to the wife's interest in the fee as marital property.

## IV.

Finally, the wife argues that the trial court erred in failing to award her alimony. The wife argues in her brief that an award of alimony would be appropriate if we were to hold that she is not entitled to a share of the Velsicol fee as marital property. Since we have found that the wife is entitled to a small share of the Velsicol fee as marital property, the wife's argument in favor of an award of alimony is tenuous at best. The wife's claim for an entitlement to an alimony award is further weakened by the fact that the alimony statute, T.C.A. § 36–5–101 provides that in determining whether a spouse is entitled to an award of alimony the court shall consider the relative fault of the parties in causing the breakup of the marriage. The trial court in the instant case specifically stated that "the evidence is clear that Mrs. Wilder's conduct with her husband's law partner, who is now a convicted felon, precipitated the failure of their marriage." Furthermore, we find that under the remaining factors listed by the alimony statute for determining whether an award of alimony is appropriate, the wife has not proved an entitlement to alimony. Accordingly, the trial court's judgment denying the wife alimony is affirmed.

## V.

For the foregoing reasons, the judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded to the trial court for a determination of the exact amount of the Velsicol fee the wife is entitled to under our opinion. The wife's petition to consider post-judgment facts is also granted and the husband is directed to supplement the record with the items we have enumerated in this opinion and to submit these items to the trial court so that a final disposition of this matter can be made. Costs are taxed to the husband.

CRAWFORD and FARMER, JJ., concur.